HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ADA YEAGER, an individual,

    Plaintiff,

v.

THE CITY OF SEATTLE, a municipal corporation,

    Defendant.

Case No. 2:20-cv-01813-RAJ

ORDER

## I. INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Emergency Temporary Restraining Order and Preliminary Injunction. Dkt. # 2. For the reasons below, the Court **DENIES** the motion.

## II. BACKGROUND

Plaintiff Ada Yeager is an unhoused individual who has been living in Cal Anderson Park since early June 2020. Dkt. # 1-2 ¶¶ 2, 6. At Cal Anderson Park, she is part of a "protest encampment," a "staging ground for daily marches, political meetings, organizing, making art, growing food, and providing community-based solutions" to other homeless persons' medical and mental health needs. *Id.* ¶¶ 2, 4. Based on her estimate, until recently, there were about 50 people also living in the park. *Id.* ¶ 9.

ORDER – 1

In the morning of December 14, 2020, several police officers entered Cal Anderson Park and notified Ms. Yeager that she must remove all her personal property from the park. *Id.* Ex. 1. The notice of eviction provided a date and time (December 16, 2020 at 7:30 a.m.) by which Ms. Yeager would have to remove her belongings. *Id.* If any of her materials remained after that date and time, they would "removed by the City," and some materials "authorized for storage" would be "kept for 70 days at no charge." *Id.* The notice provided the address of where her belongings would be stored. *Id.* It also stated that the City would deliver such belongings to her. *Id.*

Ms. Yeager refers to such an eviction as a "sweep." *Id.* ¶ 11. She says that she has been present for four previous sweeps. In the past, she claims, police officers have ordered homeless residents of Cal Anderson Park off the premises and have seized and destroyed their property. *Id.* ¶¶ 11-21.

The sweep scheduled for December 16, 2020 at 7:30 a.m. (which the Court refers to as the "intended sweep"), however, was unlike the previous. After police officers distributed notices of eviction on December 14, 2020, some occupants left. *Id.* ¶ 9. But several individuals have since flocked to the encampment, supposedly "helping unhoused people" leave the park and supposedly "building barricades to defend against police violence." Dkt. # 2 at 2. Now, besides the residents of Cal Anderson Park, there are about 200 civilians "in and around the barricades" who are "prepared to defend the encampment" from the intended sweep. *Id.*

Yesterday morning, the day of the intended sweep, Ms. Yeager filed this action and moved for a temporary restraining order ("TRO") and preliminary injunction enjoining the City from executing the sweep. Dkt. ## 1, 2. Although the City had not been served with the complaint or motion, attorneys for the City appeared in this matter and attended a 3:30 p.m. telephonic hearing with the Court and Ms. Yeager's counsel. Dkt. # 9. At the end of the hearing, the Court took Ms. Yeager's motion under

ORDER – 2

submission.[1]

## III. LEGAL STANDARD

Like a preliminary injunction, issuance of a TRO is "an extraordinary remedy never awarded as of right." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Under Federal Rule of Civil Procedure 65(b), a party seeking a TRO must make a clear showing (1) of a likelihood of success on the merits, (2) of a likelihood of suffering irreparable harm in the absence of preliminary relief, (3) that the balance of hardship tips in her favor, and (4) that a temporary restraining order in is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (articulating standard for preliminary injunction); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical").

## IV. DISCUSSION

### A. *Ex Parte* Relief

Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a temporary restraining order without notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," Fed. R. Civ. P. 65(b)(1)(A), and only if the movant's attorney certifies "any efforts made to give notice and the reasons why it should not be required," Fed. R. Civ. P. 65(b)(1)(B).

Further, under the Local Rules, issuing TROs without notice is "disfavored." Local Rules W.D. Wash. LCR 65. "Unless the requirements of Fed. R. Civ. P. 65(b) for

---

[1] This morning, the City submitted a declaration stating that Ms. Yeager "was given a referral for shelter at a tiny home community and was completing intake paperwork as of this morning." Dkt. # 10 ¶ 3. The City has not updated the Court further on this matter. If Ms. Yeager has indeed relocated before the entry of this Order, this motion would be moot. The Court enters this Order under the assumption that she has not yet relocated.

ORDER – 3

issuance without notice are satisfied, the moving party must serve all motion papers on the opposing party before or contemporaneously with the filing of the motion and include a certificate of service with the motion." *Id.* 65(b)(1).  After a motion for a TRO is served, the opposing party normally has 48 hours to file a response.  *Id.* 65(b)(5).

To the Court's knowledge, at the time this Order is entered, the City has not yet been formally served with the TRO or the Complaint.  At yesterday's telephonic hearing, the City represented that it only learned of this matter through Twitter.  Though Ms. Yeager may have specified her immediate and irreparable injury in an affidavit, Dkt. # 1-2, her counsel has not "certifie[d] in writing any efforts made to give notice and the reasons why it should not be required," Fed. R. Civ. P. 65(b)(1)(B).  Thus, putting the merits of the motion aside, the Court should not issue a TRO *ex parte* because it is unclear whether Ms. Yeager has satisfied the federal and local procedures required for the Court to do so.

In any event, at the telephonic hearing, both Ms. Yeager and the City described the events at Cal Anderson Park as urgent and imminent.  The City agreed to argue the merits of the motion without the benefit of filing a written response.  Both parties asked for a swift ruling from the Court.  The Court will oblige.

### B. Likelihood of Success on the Merits

Ms. Yeager claims that the City violated her constitutional rights under the First Amendment, Fourth Amendment, and Fourteenth Amendment.  Dkt. # 1 ¶¶ 2.1, 4.2-4.4.  She is not suing any individual officer or employee of the City.  Rather, she is suing the City as a municipal corporation and is asserting her constitutional claims under 42 U.S.C. § 1983.  *Id.*  To that end, for each constitutional deprivation that she asserts, she must satisfy the demands of *Monell v. New York City Dep't of Public Servs.*, 436 U.S. 658, 691 (1978).

#### i. *Monell*

Under *Monell*, a municipality cannot be held liable for constitutional injuries

ORDER – 4

inflicted by its employees on a theory of respondeat superior. 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

To establish municipal liability, a plaintiff must "prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (internal quotation marks omitted).[2] Moreover, this municipal policy or custom must be the "moving force" behind the constitutional violation. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996). In other words, plaintiff must show that the municipal policy or custom *caused* the constitutional violation. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012).

For Ms. Yeager to prove a likelihood of success on the merits, she must show that the City, as a municipality, is likely to be liable for at least one of her constitutional deprivations under *Monell*. The Court now turns to each alleged violation.

**ii. First Amendment**

Ms. Yeager claims that the intended sweep violates the First Amendment because "maintaining tents and temporary structures" in public fora, like parks, have expressive

---

[2] A plaintiff may also prove municipal liability under other theories. For example, a plaintiff may show that the person who committed the constitutional tort was an official with "final policy-making authority," making the challenged action itself an official government act. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). A plaintiff may also show that an official with final policy-making authority "ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.*; *see also Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (also articulating "failure to train" theory of municipal liability). Based on her motion, Ms. Yeager does not appear to invoke any of these theories. Instead, she claims that the City should be held liable for its "pattern and practice" of forcible evictions. Dkt. # 2 at 1.

ORDER – 5

speech value.  Dkt. # 2 at 12.  According to her, over the past several months, Cal Anderson Park has been the "undisputable hub of the recent civil rights uprising."  *Id.*  She assures the Court—without any evidence—that the City is "obviously targeting" the Cal Anderson encampment for "special enforcement."  *Id.* at 13.

First Amendment claims are subject to a "forum analysis."  *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097-99 (9th Cir. 2003) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983)).  First, the Court must determine whether the nature of the location where the speech is to take place is a "traditional public forum, a designated public forum, or a nonpublic forum."  *Id.*  Then, it must determine the standard of scrutiny to decide whether the "restrictions in question pass constitutional muster."  *Id.*  Here, the alleged speech is taking place in a park, a traditional public forum.  *Id.*  In such forums, the government may enforce regulations of the "time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.*

Ms. Yeager's First Amendment violation argument falls short for several reasons.  First, her briefing does not challenge a statute or an ordinance or any policy, and thus she has hardly given the Court anything to scrutinize.  Second, and more fundamentally, even if she had identified a policy, the evidence that she has offered to show that the City's intended evictions are content-based is slim.  She provides her own speculations and a blog post allegedly quoting Mayor Jenny Durkan as saying that the need to "restore" Cal Anderson Park is "urgent."  Dkt. # 2 at 13.  Beyond that there is no evidence that the intended evictions are based on the content of Ms. Yeager's supposed expressive speech, which she claims is aimed at "providing community-based solutions to [homeless persons] medical and mental health care needs."  Dkt. # 1-1 ¶ 4.[3]

---

[3] At 2:36 P.M. today, Ms. Yeager's counsel filed a declaration with the Court.  Dkt. # 12.  In his declaration, he claims that Mayor Jenny Durkan made yet another public comment,

ORDER – 6

At the telephonic hearing, the City represented that the public safety reasons for the evictions are overwhelming. According to the City, violence around the park has increased. Within the park, the City said, park employees and law enforcement officers have been met with threats of physical violence, and there have been at least five fires and two medical calls arising out of incidents in Cal Anderson Park. The City even cited some deaths that have occurred. Moreover, the City said that one individual punched a law enforcement officer, and another pushed an officer and was arrested. Since the notice of eviction was posted, new obstructions such as fences and barricades were installed limiting ingress and egress. These reasons provided are content-neutral, further undermining Ms. Yeager's argument.

Finally, she has not met her burden under *Monell*. Her declaration describes the actions of individual police officers. Dkt. # 1-2. Even if individual officers' actions had been motivated by the content of Ms. Yeager's speech, she has not shown that they were committed pursuant to a City policy or custom. For example, she has not shown that these actions were done under a "longstanding practice or custom which constitutes the standard operating procedure" of the City or that it is a custom "so persistent and widespread" that it constitutes well-settled policy. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency

---

this time calling the Cal Anderson encampment "a political occupation" and stating that the City will not raid any other encampments. *Id.* ¶ 3. He also attaches correspondence between a non-party and the Superintendent's Office of Seattle Parks and Recreation saying that the City will not sweep other encampments. *Id.* ¶ 4. This eleventh-hour declaration does not change the analysis. Mayor Jenny Durkan's supposed statements are provided with no context, providing little to no probative value. And counsel's cribbing of the correspondence with the superintendent's office is self-serving. True, the representative conceded that parks other than Cal Anderson Park would not be swept. But the representative clearly stated that Cal Anderson Park was being singled-out because city employees "have been met with threats of physical violence." Dkt. # 12 at 4. This evidence still fails to show that the City's actions are content-based.

ORDER – 7

and consistency that the conduct has become a traditional method of carrying out policy.").

### iii. Fourth Amendment

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Ms. Yeager relies principally on the Ninth Circuit's ruling in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012). That case was set in the Skid Row district of Los Angeles, which hosted the highest concentration of homeless persons in the City. *Id.* at 1024. Homeless residents often stored their personal possessions (such as, "personal identification documents, birth certificates, medications, family memorabilia, toiletries, cell phones, sleeping bags and blankets") on sidewalks. *Id.* at 1025. On several occasions, when some homeless residents stepped away to shower, eat, use restrooms, or the like, City of Los Angeles employees "seized and summarily destroyed" their belongings. *Id.* The City of Los Angeles did not deny that it had a "policy and practice of seizing and destroying homeless persons' unabandoned possessions." *Id.*

As to the Fourth Amendment issue, the Ninth Circuit made at least two key findings. First, it determined that homeless persons had a protectable possessory interest in their "unabandoned legal papers, shelters, and personal effects." *Id.* at 1030. Second, it determined that, because the City of Los Angeles meaningfully interfered with that possessory interest, it had to comply with the Fourth Amendment's reasonable requirement. *Id.* The City of Los Angeles could not so comply, the court reasoned, because "collecting and destroying Appellees' property on the spot" was unreasonable. *Id.*

Here, Ms. Yeager, no doubt, has a protectable property interest in her "tents,

ORDER – 8

blankets, tarps, medication, personal papers" and other personal belongings. Dkt. # 2 at 5. *Lavan* plainly says so. But the facts of this case fundamentally diverge from *Lavan*'s holding in several ways.

First, there is hardly any evidence in the record to conclude that the City has, in fact, engaged in the type of on-the-spot destruction of property that the City of Los Angeles did. Ms. Yeager's motion is supported by just two declarations. Dkt. ## 1-2, 1-3. Ms. Yeager declares that in past police sweeps, officers "seized and/or destroyed all property still in the park" after they ordered all homeless residents to leave. Dkt. # 1-2 ¶¶ 11, 15-20. This single declaration is insufficient to establish extraordinary relief. And some of the evidence that Ms. Yeager does provide undermines her account. The notice of removal that was posted in Cal Anderson Park clearly states that "[a]ny materials left here will be removed by the City . . ., and belongings found by the City and authorized for storage will be kept for 70 days at no charge." *Id.* Ex. 1. In short, based on the evidence provided, the City's current procedure for dealing with homeless persons' belongings (whatever that may be) and the City of Los Angeles's unreasonable on-the-spot destruction of belongings in *Lavan* are not the same.

Second, even if it were true that police officers engaged in the "wholesale destruction of plaintiffs' [sic] personal belongings" as Ms. Yeager contends, Dkt. # 2 at 5, Ms. Yeager has failed to show that such destruction was pursuant to the City's policy or custom. Thus, Ms. Yeager again fails to meet her *Monell* burden.

Setting *Lavan* aside and conducting the Fourth Amendment "reasonableness" analysis anew, the Court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Because both parties have asked this Court to resolve this matter swiftly given the pressing nature of this motion, the Court does not have the benefit of the City's response to Ms. Yeager's claims. Therefore, the Court lacks evidence of "countervailing governmental interests at

ORDER – 9

stake." Ms. Yeager hardly supplies any, other than to say that there are "general health and safety" concerns presented by the encampments. Dkt. # 2 at 6. At the telephonic hearing, however, the City represented that the governmental interests are great. Since late November, the City represented, there have been at least five fires and two medical calls arising out of incidents in Cal Anderson Park and members of the park have become increasingly violent. *See supra* Section IV.B.ii.

Based on the evidence presented, the Court determines that Ms. Yeager has not shown a likelihood of success on the merits that previous police sweeps or the intended police sweep has resulted or will result in an unreasonable seizures in violation of her Fourth Amendment rights.

### iv.     Eighth Amendment

In her motion, Ms. Yeager argues that she is likely to succeed on her Eighth Amendment claim. Dkt. # 2 at 13-14. But she does not allege an Eighth Amendment violation in her complaint. Dkt. # 1 ¶¶ 4.1-4.4. Because she cannot possibly succeed on a claim that she has not pled, her likelihood of success on this ground is currently zero.

To be sure, even if Ms. Yeager did plead an Eighth Amendment violation the result would be the same. She bases this claim on a "clear violation" of *Martin v. City of Boise*, 920 F.3d 584, 616-17 (9th Cir.), *cert. denied sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674, 205 L. Ed. 2d 438 (2019). In *Martin*, the Ninth Circuit held that "'so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters],' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'" *Id.* at 617 (alteration in original). The majority, in no uncertain terms said, "Our holding is a narrow one." *Id.*

Ms. Yeager concedes that there is no criminal statute here, like the one in *Martin*. Dkt. # 2 at 13-14. Instead, she asks the Court to see the "reality" that although the intended police sweep is not based on a criminal law, it still "criminaliz[es] survival under a government that does not provide sufficient resources to allow survival." *Id.*

ORDER – 10

The Court will not stretch the self-professed "narrow" holding in *Martin* to now include non-criminal statutes. Thus, Ms. Yeager's argument fails.

### v. Fourteenth Amendment

The Fourteenth Amendment maintains that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Court's analysis is two-fold. First, it must ask whether the "asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property.'" *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1031 (9th Cir. 2012) (quoting *Ingraham v. Wright*, 430 U.S. 651, 672 (1977)). If so, it must determine what procedures constitute "due process of law." *Id.*

To determine whether Ms. Yeager has a protected property interest under the Fourteenth Amendment, the Court looks to "existing rules or understandings that stem from an independent source such as state law-rules or understandings." *Id.* (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Ms. Yeager has failed to identify any "state law-rules or understandings" deeming the personal belongings here as protected property interests under the Fourteenth Amendment.

That aside, assuming such Washington rules or understandings indeed exist and that Ms. Yeager has simply failed to cite them, the Court must determine what constitutes due process. To that end, it turns to the factors outlined in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Due process is not a "technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334. It is "flexible" and "calls for such procedural protections as the particular situation demands." *Id.* The Supreme Court has set forth three factors that the Court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function

ORDER – 11

>involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Ms. Yeager requests that this Court measure the City's intended police sweep against this standard. Dkt. # 2 at 6-11.

The Court has one question: what is the City's policy or practice for taking a homeless person's possessions? Ms. Yeager's brief leaves the Court without an answer. Ms. Yeager claims that, in the past, the City has engaged in the "summary destruction of property, whether it is incident to an individual's removal, or when the individual is unable to move it during a sweep." Dkt. # 2 at 7. She claims that "Defendants regularly destroy property without any opportunity to challenge the basis for the destruction." *Id.* at 8. She claims that owners of seized property are often "given no notice where they can pick up their property," and when they are given notice, the notice is "inaccurate and does not outline the process actually required to get their property back." *Id.* at 9. For all these claims, Ms. Yeager cites no evidence. The Court simply cannot assess any of the City's "procedural safeguards" or "requirements" when Ms. Yeager has not explained what the City's procedure is in the first place. Hence, the Court cannot know whether any alleged taking has comported with due process.

As to the intended police sweep, the Court has some insight on what procedure is to be used. Specifically, the Court has what is stated in the notice of eviction. Dkt. # 1-2 Ex. 1. On December 14, 2020, police officers entered Cal Anderson Park and notified Ms. Yeager to remove all her personal property within two days. *Id.* ¶ 1.[4] The notice named the time and place her personal belongings would be subject to removal. *Id.* It stated that any materials that remained after the date and time specified in the notice would be removed and that "belongings found by the City and authorized for storage

---

[4] At the telephonic hearing, the City represented that city employees tried to provide notice to all occupants of Cal Anderson Park but were forced to leave after the occupants threatened them. The City stated that the employees managed to distribute three notices. Ms. Yeager states that she received one of these notices. Dkt. # 1-2 ¶ 1.

ORDER – 12

w[ould] be kept for 70 days at no charge." *Id.*

Looking at this stated process alone, the Court makes two points. First, Ms. Yeager claims that she seeks "only what *Lavan* commands," Dkt. # 2 at 8—what *Lavan* commanded has no bearing on the Fourteenth Amendment analysis here. *Lavan* concerned the "on-the-spot destruction of seized property" with no notice to homeless persons at all. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012). Unlike the plaintiffs in *Lavan*, Ms. Yeager plainly has notice. Dkt. # 1-2 Ex. 1. She may take all her belongings with her. The items that she leaves behind may not be destroyed on the spot but rather stored for 70 days. *Id.* The City notified her where her belongings will be stored, and the City will even deliver them to her. *Id.*

Second, Ms. Yeager has failed to show that this process is insufficient under *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). The Court does not doubt that the private interests affected by this action are substantial. "For many of us, the loss of our personal effects may pose a minor inconvenience. However, . . . the loss can be devastating for the homeless." *Lavan*, 693 F.3d at 1032. And the City's timing is regrettable—clearing the park during the winter season during a pandemic.

But the Court must examine the other two *Eldridge* factors. Ms. Yeager has not shown that there is a "risk of an erroneous deprivation" through the procedures set forth in the eviction notice and has not identified any "substitute procedural safeguards." *Eldridge*, 424 U.S. at 334-35. She claims that the storage facility is a great distance away. Dkt. # 2 at 10. But the notice provides that the City will deliver any stored belongings to individuals. Dkt. # 1-2 Ex. 1. She suggests that some residents may be unable to move all their property in the "limited amount of time Defendants provide." Dkt. # 2 at 11. She provides no evidence for this claim nor does she suggest an alternative, sufficient window of time. Finally, as the City represented at oral argument and as explained above, the government's interest in the public health and safety is substantial. *See supra* Section IV.B.ii.

ORDER – 13

Balancing the three *Eldridge* factors, Ms. Yeager has failed to show by clear and convincing evidence that she is likely to succeed on her Fourteenth Amendment claim.

### V.   CONCLUSION

In sum, Ms. Yeager fails to show a likelihood of success on the merits. The Court also finds that he has not raised "serious questions going to the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Failure to satisfy this prong is fatal to Ms. Yeager's motion. *Winter* requires a plaintiff to establish all four prongs. *Haskell v. Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014). The first prong, likelihood of success on the merits, is the "most important," and when "a plaintiff has failed to show the likelihood of success on the merits, [courts] 'need not consider the remaining three [*Winter* elements].'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (second alteration in original) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)). Because Ms. Yeager has failed to establish the first *Winter* prong, the Court declines to address the other three.

For the reasons stated above, Plaintiff's request for a temporary restraining order is **DENIED**. Dkt. # 2. By December 28, 2020, the parties shall submit a joint statement to the Court, proposing a briefing schedule for a motion for preliminary injunction. That statement shall not exceed five pages. If the parties cannot agree on a schedule, they shall set forth their respective positions in the statement.

DATED this 17th day of December, 2020.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Judge

ORDER – 14